IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE

Assigned on Briefs October 1, 2024, at Jackson

## STATE OF TENNESSEE v. D'TEARIUS CARVELL SOUTHERN

**Appeal from the Criminal Court for Knox County**
**No. 121898    Steven Wayne Sword, Judge**

_____

## No. E2024-00112-CCA-R3-CD

_____

A Knox County jury convicted Defendant, D'tearius Carvell Southern, of second degree murder, aggravated assault, two counts of reckless endangerment with a deadly weapon, tampering with evidence, and being a felon in possession of a firearm. Defendant received an effective sentence of twenty-three years to be served in confinement. On appeal, Defendant contends that the evidence was not sufficient to support his conviction for second degree murder and that the trial court erred by declining to instruct the jury that Defendant had no duty to retreat before using deadly force as part of the self-defense instruction. After review, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

MATTHEW J. WILSON, J., delivered the opinion of the court, in which ROBERT H. MONTGOMERY, JR., and TIMOTHY L. EASTER, JJ., joined.

Susan Shipley, Knoxville, Tennessee, for the appellant, D'tearius Carvell Southern.

Jonathan Skrmetti, Attorney General and Reporter; Johnny Cerisano, Assistant Attorney General; Charme P. Allen, District Attorney General; and Joanie Stewart and Sean Bright, Assistant District Attorneys General, for the appellee, State of Tennessee.

## OPINION

### I. Facts and Procedural History

On December 31, 2021, Defendant shot and killed Terrel Kemp in Mr. Kemp's home. Mr. Kemp was in a relationship with Gabriela Minor, Defendant's former girlfriend. Ms. Minor and multiple children were inside the home at the time of the shooting. On June 30, 2022, a Knox County Grand Jury returned a seven-count indictment charging

Defendant with first degree premeditated murder, aggravated assault, two counts of reckless endangerment with a deadly weapon, tampering with evidence, misdemeanor theft, and being a felon in possession of a firearm. Defendant proceeded to trial in January 2023.

*State's Proof*

According to the evidence presented at trial, Ms. Minor began dating Mr. Kemp a few months after her five-year relationship with Defendant ended in 2021. Ms. Minor subsequently moved into Mr. Kemp's home with her minor daughter and her two-year old son, whom she shared with Defendant. Ms. Minor testified that on December 31, 2021, she and Mr. Kemp made plans to meet with Defendant before Ms. Minor and Mr. Kemp went to the home of Mr. Kemp's relatives with Ms. Minor's two children and Mr. Kemp's son. She explained that she and Mr. Kemp were growing serious in their relationship and that they invited Defendant into their home "for the kids." Ms. Minor also requested Defendant's assistance in addressing their son's behavioral issues.

Ms. Minor testified that Defendant requested that Mr. Kemp pick him up from his apartment. Mr. Kemp left his home to retrieve Defendant at approximately 2:00 p.m. and returned with Defendant approximately forty-five minutes later. Defendant had asked to do his laundry at the home, and Ms. Minor and Mr. Kemp agreed. Defendant entered the home with multiple bags of clothing, a small bottle of tequila, cigarillos, and marijuana. Ms. Minor did not see a firearm on Defendant's person. Mr. Kemp had stopped at a liquor store and purchased a bottle of tequila.

At the home, Defendant visited the children and put his clothes in the washing machine. At approximately 3:00 p.m., Defendant, Mr. Kemp, and Ms. Minor began smoking marijuana and drinking tequila together. Ms. Minor denied seeing Mr. Kemp ingesting cocaine. She testified that she had "one or two shots" of alcohol while Defendant, in contrast, "was getting very drunk" and "started saying some weird things," like "we should all move into a home together and raise the kids together." She recalled that when Defendant finished his bottle of tequila, he began drinking from the liquor bottle Mr. Kemp had purchased. Ms. Minor grew concerned about the "change" in Defendant's behavior and voiced her concerns with Mr. Kemp when they stepped outside to smoke a cigarette. Mr. Kemp agreed, stating that they should "try and wrap it up and get [Defendant] to leave," albeit "in a calm[]" manner.

Ms. Minor and Mr. Kemp then joined Defendant at the kitchen table. The mood continued to be "fine," until shortly thereafter, Defendant reached under the table and grabbed Ms. Minor's leg at her knee. Ms. Minor interpreted this action as an "advance," which made her feel "very uncomfortable and uneasy." Both Ms. Minor and Mr. Kemp

vocalized their anger, but Defendant "acted like he didn't do anything." Defendant's denial angered Ms. Minor, and all three of them began loudly arguing. They then rose from the table, and as the arguing "escalated," they started moving into the hallway. Ms. Minor stood between Defendant and Mr. Kemp with her back to Defendant.

Ms. Minor testified that she told Defendant that he needed to leave, and that Defendant refused stating, "Not till my laundry is done. I don't have a car. I don't have a ride. You're going to wait till my laundry is done." Ms. Minor said Defendant's response made her feel "[m]ore uneasy." She told the children to sit on the living room couch so they would not be near the arguing. Meanwhile, she described Defendant's demeanor: "[Defendant] was kind of like bucking up, standing like – just getting more angry. [Defendant's] body language was definitely angry and just mean." Ms. Minor said Mr. Kemp was acting "[s]ort of the same" but was doing so in an effort to protect her. They continued moving toward the living room, and Mr. Kemp stated that he wanted to go to the living room where there was a camera to record the confrontation.

Ms. Minor testified that as the men continued to argue "back and forth," she "[turned] around to look at the kids" to make "sure they are okay." Then, Mr. Kemp ran towards Defendant. Ms. Minor said "And that's when I heard a shot, and then I saw smoke. And I saw -- I saw Mr. Kemp run. And then I heard a second shot, and he collapsed at the front door." Ms. Minor said that she never saw Mr. Kemp with a gun and that she later found his gun in the glove box of her car. She also said she never saw Mr. Kemp make physical contact with Defendant. Mr. Kemp was within a few feet of Defendant when the first shot was fired; two of the children were approximately five feet away; and Ms. Minor was approximately three feet away. The first shot struck Mr. Kemp in his chest, and the second shot was fired "[s]econds" later while Mr. Kemp was facing the door and trying to exit the house. After the second shot, Mr. Kemp "fell to his knees" and "hunched over." Defendant then immediately moved over to Mr. Kemp, grabbed him by the hood of his sweater, and flipped him onto his back.

Defendant pulled Ms. Minor down by her neck to prevent her from leaving, causing minor injuries and tearing her shirt. Defendant closed the front door and locked it. Ms. Minor performed CPR on Mr. Kemp, and when she took out her cell phone to call 911, Defendant took her cell phone from her. Still-shot images from cameras inside the home showed Ms. Minor's daughter and Mr. Kemp's son sitting on the couch in the living room at 5:57 p.m., Defendant and Mr. Kemp arguing at approximately 6:02 p.m., and Ms. Minor performing CPR on Mr. Kemp at approximately 6:03 p.m.

Defendant did not render any aid to Mr. Kemp and did not attempt to comfort the children. When Ms. Minor began screaming, Defendant pointed the barrel of the gun in her face and told her to "shut up[.]" Ms. Minor recalled that Defendant was not wearing

his glasses at this point but testified that he had them on when he shot Mr. Kemp. Defendant fled the home. A neighbor called 911, and Ms. Minor continued performing CPR on Mr. Kemp until the police arrived.

Ms. Minor was interviewed by police following the shooting and told an officer that she did not see Defendant point a gun at her. She explained that when she spoke to the officer, she was still upset and in shock over the shooting. An officer took photographs of multiple scratches on Ms. Minor's neck and upper chest, in addition to her torn shirt. Ms. Minor acknowledged that she testified during the preliminary hearing that prior to the shooting, Defendant was "screaming" and "spitting" in Mr. Kemp's face and that Mr. Kemp charged at Defendant and knocked Defendant's glasses off his face. She affirmed at trial that no physical altercation between Mr. Kemp and Defendant occurred until after Defendant had grabbed her leg.

Beverly Willard was on the front porch of her brother's home located a few houses down from Mr. Kemp's home when she heard two gun shots in quick succession and immediately retreated into her house to call 911. While calling 911, Ms. Willard saw a woman in Mr. Kemp's driveway "hollering for help, help, help." Ms. Willard saw the woman go back into the home and then run back out saying, "[G]et the kids." From her brother's porch, Ms. Willard saw two young children come out of the home, and she shouted at them to come over to her. Ms. Willard asked the woman in the street if anyone was hurt, to which the woman replied "yes." When Ms. Willard asked if the person were alive, the woman answered "no[.]" Ms. Willard recalled the children were "quiet and distraught" and that they "were scared to death."

Ms. Minor testified that Mr. Kemp kept his wallet in his back pocket. On the morning of January 1, 2022, Jason Kiestler, who lived in the area where the shooting occurred, found Mr. Kemp's wallet on the ground near a stop sign while Mr. Kiestler was walking his dog. Mr. Kiestler turned over the wallet to the police. Police later located a nine-millimeter magazine near the same area.

Crime scene technician Amy Hill processed the scene on behalf of the Knoxville Police Department (KPD) Forensic Unit. Ms. Hill testified that when she arrived, she saw Mr. Kemp lying on the floor in the living room. She did not identify any wounds, scrapes, or abrasions on Mr. Kemp, indicating that he had been in an altercation. Ms. Hill located a fired bullet on the floor above Mr. Kemp's left shoulder and a "bullet strike" on the wall just above a light switch near the front door. Ms. Hill found a cartridge casing in a child's bedroom, along with an additional casing in the bathroom opposite the bedroom. Ms. Hill received a second fired bullet that was retrieved during Mr. Kemp's autopsy. Ms. Hill stated that the gate to a fence in the backyard was open, and she located a shoeprint in the mud near the gate and the tip of a cigar in the leaves just outside the gate.

Dr. Gayle Suzuki, an assistant medical examiner, testified regarding Dr. Travis Danielsen's autopsy of Mr. Kemp. Dr. Suzuki stated that Mr. Kemp sustained two gunshot wounds. One bullet entered the right side of Mr. Kemp's chest and traveled "front to back, right to the left and downward[,]" striking the arch of the aorta and the left lung before exiting the back. Dr. Suzuki stated that the wound was fatal and that the soot and searing around the entry wound indicated the muzzle of the gun was up against Mr. Kemp's body when the gun was fired. A second bullet entered the lower left side of Mr. Kemp's back, and Dr. Suzuki stated that the gun was fired from an indeterminate range. The bullet traveled "back to front, left to right and upward[,]" and struck Mr. Kemp's spine and heart. This bullet did not exit the body and was removed during the autopsy.

Dr. Suzuki testified that the toxicology report established that Mr. Kemp's blood alcohol level was .08 percent and that cocaine and marijuana were also present in Mr. Kemp's blood. Dr. Suzuki stated that the presence of cocaethylene indicated that the cocaine and alcohol were "consumed around the same time[.]" She concluded that the cause of Mr. Kemp's death was multiple gunshot wounds and that the manner of his death was homicide.

KPD Sergeant Brian Dalton, a forensic firearm and toolmark examiner, examined the two cartridge cases and projectile recovered from the scene and the bullet recovered from Defendant's body. He determined that the 9 mm cartridge cases were fired from the same firearm, that the two projectiles were fired from the same firearm, and that the caliber of the projectiles was consistent with the caliber of the cartridge cases.

Following the shooting, law enforcement officers attempted to locate Defendant, but they were unable to locate him at his home or the homes of his family members and friends. Approximately five days after the shooting, officers learned that Defendant had contacted "some individuals in the community" about turning himself in with the help of his attorney, but Defendant failed to do so. Defendant finally turned himself in at the Knox County Intake Facility twelve days after the shooting. The State submitted a certified judgment establishing that Defendant was convicted of a felony drug offense in 2019.

*Defendant's Testimony*

Defendant testified on his own behalf. According to Defendant, he and Ms. Minor began dating in 2017, and they engaged in a liaison after their relationship ended. He stated this liaison continued until shortly after Ms. Minor became involved with Mr. Kemp. Defendant testified that he experienced an ongoing conflict with Ms. Minor because she prevented him from seeing their son. He spent the 2021 Christmas holiday with their son, and he returned their son to Ms. Minor on December 30, 2021, after their son became sick.

On December 31 at around 11:00 a.m. or noon, Ms. Minor reached out to him via Facebook and requested that he come help with their son, who was "acting out[.]" Defendant stated that he initially declined the offer but agreed when Ms. Minor arranged to give him a ride and allow him to wash his laundry at the house. Defendant recalled that Mr. Kemp, after stopping at a liquor store, picked him up around 2:30 p.m. on the day of the shooting. Defendant brought a half of a bottle of tequila with him.

Defendant noted that when he arrived at the home, the mood was "relaxed" and that the children ran up to him. He placed his clothes in the washer, and the adults then began drinking tequila and smoking marijuana at the kitchen table. Defendant claimed that he drank "three, four shots, five at the maximum." He recalled Ms. Minor was "tipsy" and that Mr. Kemp's entire bottle of tequila was emptied although Defendant denied drinking any of Mr. Kemp's tequila. Defendant did not recall witnessing anyone consuming cocaine.

Defendant testified that as he was rolling marijuana in a cigar, he "tap[ped]" Ms. Minor's knee, but he denied touching any other part of Ms. Minor's leg. According to Defendant, "[i]t was just an attention thing because the music was going on, and I was already in position right there. I just looked at the knee and just tapped it . . . . I don't know how else to explain it." He said that Mr. Kemp appeared upset and that Mr. Kemp questioned Defendant's intentions and accused Defendant of "being disrespectful" and "doing other things, other than what [he] came here for." Defendant denied the accusation, prompting Mr. Kemp to stand up and start walking towards Defendant. In response, Defendant stood up, and they all began yelling.

Ms. Minor and Mr. Kemp then spoke amongst themselves, and Ms. Minor asked Defendant to leave. Defendant testified that he replied, "I will leave, but I need my laundry." They continued arguing and moved into the living room with Mr. Kemp in front of Defendant and Ms. Minor behind Defendant. Defendant testified that he continued to argue with Mr. Kemp, recalling "at this point I'm mad – I ain't mad, but I'm just like – I feel some type of way because I'm being – I'm being, like, hassled over something I really didn't do." Defendant claimed that he wanted to leave the house to wait for his laundry outside and because he did not want anything to occur in front of the children, but he was "blocked" from leaving as Mr. Kemp was in between him and the door. Defendant testified that Mr. Kemp then unexpectedly punched him in his face, knocking off his glasses. Defendant stated that as he was collecting himself after being hit and preparing to punch Mr. Kemp back, he saw Mr. Kemp reach for his waistband. Unsure of what Mr. Kemp was reaching for, Defendant "went two hands with him," and "it turned out to be a gun." Defendant said, "That's when a struggle ensued. I went two hands, so I was able to get more of the gun than him. And when we're struggling over it, he got shot." Defendant described the second shot, stating:

[T]he second shot was really accidental. It wasn't -- it wasn't a purpose thing. We were still struggling over the weapon. I'm trying to take it from him at that time, and he still, like, got it, but he trying to, like, spin in some way. I can't even describe it. Everything happened so fast. And that's how the second shot really just happened.

Defendant testified that he was "in shock" and asked Ms. Minor to help find his glasses. He stated that after Mr. Kemp fell to the ground, Defendant "grabbed him by his hoodie" and "placed him on his back" so Ms. Minor could perform CPR. He explained that he closed the front door because he assumed his glasses went behind the door. He agreed that he took Ms. Minor's cell phone from her but stated he did it so she could continue to perform CPR. He maintained that he was unable to call 911 using Ms. Minor's cell phone because he could not unlock it. By the time Defendant had found his glasses, Ms. Minor and the children had "ran out" of the house. Defendant "panicked and just grabbed [his] stuff and left," running to the "nearest spot" where he felt "safe."

Defendant stated that he "was going to call the police" but failed to so because his cell phone battery was dead. He stated that nevertheless, he heard sirens and knew that the police were on their way. When asked why he did not call the police thereafter, he stated, "I can't give an answer to that." When asked why he did not surrender to law enforcement, he claimed he was "trying to collect money" for an attorney. He testified that he felt like he did not have a choice in the shooting because he believed Mr. Kemp would have tried to shoot him if Mr. Kemp had control of the gun.

On cross-examination, Defendant confirmed that he disposed of the loaded firearm in the woods but denied removing the magazine before doing so. He acknowledged that he could only be on Mr. Kemp's property by permission and that he was required to leave had Mr. Kemp or Ms. Minor asked him to do so. Defendant acknowledged sending text messages to Mr. Kemp in which he threatened to "beat" Mr. Kemp, but Defendant maintained that Mr. Kemp also threatened him.[1] When questioned about a text message that he sent to Mr. Kemp on December 19 stating, "You-all going to get beat as a couple," Defendant testified, "It was tension during that time." Defendant said his text message to Mr. Kemp stating, "Just remember you called me out. I'm about to beat the f*** out of you on God," was a response to Mr. Kemp's text message where he "called [Defendant] out." Defendant also acknowledged sending Mr. Kemp a text message stating, "We can fight every time we see each other on God. Don't play with me." Defendant also sent text

---

[1] Following the shooting, officers located Mr. Kemp's cell phone near his body, and officers located Defendant's cell phone at a pawn shop about two months after the shooting. Forensic extractions were conducted on both cell phones, and the forensic extractions showed text messages between Defendant and Mr. Kemp.

messages to Mr. Kemp in which he stated that he did not want Mr. Kemp acting as a father to Defendant's child. However, when asked about a text message from Mr. Kemp, which stated that "your son want to see you fool," Defendant testified that he likely "had something going on that moment."

Defendant denied taking a gun to Mr. Kemp's home on the day of the shooting. He maintained that he "tapped" Ms. Minor's knee to ask her a question. He stated that he shot Mr. Kemp in self-defense. He agreed that prior to the shooting, he had been asked to leave and stated, "I was on my way outside. [Mr. Kemp] got in front of me. He blocked my pathway to the outside." Defendant stated that he planned to wait outside for Ms. Minor to bring his laundry to him: "I was on my way outside when she asked me to leave." When asked whether he was "standing still at any point after they said that," Defendant replied, "I mean, we was arguing like I said, but eventually I made my way to the front door."

Defendant acknowledged shooting Mr. Kemp in his chest and back but maintained he did so while struggling with him over the gun. Defendant stated that following the shooting, he should have remained at the scene but that he "left in a panic." He said he left the house through the backyard, jumped over the fence, and went to a friend's home. He denied hearing Ms. Minor's screaming as he was leaving and stated, "All I heard was sirens."

Defendant confirmed that after the shooting, he eventually gave his cell phone to his godmother, who took it to the pawnshop where it was later recovered by police. Despite previously stating that he could not call 911 due to his phone being dead, Defendant conceded that he called a friend after the shooting and asked the friend to remove some items from Defendant's vehicle. Finally, Defendant agreed that he had prior convictions for misdemeanor theft and a felony drug offense.

At the conclusion of the trial, the jury found Defendant guilty of second degree murder as a lesser included offense to first degree premeditated murder in Count 1, acquitted him of the theft charge in Count 6, and convicted him of aggravated assault, two counts of reckless endangerment with a deadly weapon, tampering with evidence, and being a felon in possession of a firearm. At a subsequent sentencing hearing, the court imposed an effective sentence of twenty-three years' confinement, to be served at a rate of 100 percent.[2]

---

[2] Defendant raises no sentencing issues on appeal.

## II. Analysis

### A. Sufficiency of the Evidence

Defendant argues that the evidence was insufficient to establish second degree murder. Specifically, he contends there was insufficient proof that he knowingly killed Mr. Kemp and that the evidence showed that his actions were "committed impulsively" and in the "heat of passion[.]" The State argues that when viewed the light most favorable to the State, the evidence was sufficient to establish second degree murder. We agree with the State.

### 1. Standard of Review

The standard of review for a claim challenging the sufficiency of the evidence is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (emphasis in original) (citing *Johnson v. Louisiana*, 406 U.S. 356, 362 (1972)); *see also State v. Davis*, 354 S.W.3d 718, 729 (Tenn. 2011); Tenn. R. App. P. 13(e). "This standard of review is identical whether the conviction is predicated on direct or circumstantial evidence, or a combination of both." *State v. Williams*, 558 S.W.3d 633, 638 (Tenn. 2018) (citing *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011)).

A guilty verdict removes the presumption of innocence and replaces it with one of guilt on appeal; therefore, the burden is shifted to the defendant to show why the evidence is legally insufficient to support the conviction. *Davis*, 354 S.W.3d at 729 (citing *State v. Sisk*, 343 S.W.3d 60, 65 (Tenn. 2011)). On appeal, "we afford the prosecution the strongest legitimate view of the evidence as well as all reasonable and legitimate inferences which may be drawn therefrom." *Id.* at 729 (quoting *State v. Majors*, 318 S.W.3d 850, 857 (Tenn. 2010)); *State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn. 1978). In a jury trial, questions involving the credibility of the witnesses and the weight and value to be given to evidence, as well as all factual disputes raised by such evidence, are resolved by the jury as the trier of fact. *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997); *State v. Pruett*, 788 S.W.2d 405, 410 (Tenn. 1990). Therefore, we are precluded from re-weighing or reconsidering the evidence when evaluating the convicting proof. *State v. Stephens*, 521 S.W.3d 718, 724 (Tenn. 2017).

### 2. Second Degree Murder

Under Tennessee Code Annotated section 39-13-210(a)(1), second degree murder is the "knowing killing of another[.]" Our supreme court has instructed:

Second degree murder is a result of conduct offense and accordingly, [t]he nature of the conduct that causes death or the manner in which one is killed is inconsequential under the second degree murder statute. The statute focuses purely on the result and punishes an actor who knowingly causes another's death.

*State v. Brown*, 311 S.W.3d 422, 431-32 (Tenn. 2010) (internal quotation marks and citations omitted). "A person acts knowingly with respect to a result of the person's conduct when the person is aware that the conduct is reasonably certain to cause the result." Tenn. Code Ann. § 39-11-302(b). "Whether a defendant acted knowingly in killing another is a question of fact for the jury." *State v. Davis*, 466 S.W.3d 49, 69 (Tenn. 2015) (citing *Brown,* 311 S.W.3d at 432). "The jury may infer a defendant's mental state from the character of the assault, the nature of the act and from all the circumstances of the case in evidence." *Id*. (quotation mark and citation omitted).

When viewed in the light most favorable to the State, there is ample evidence to support the jury's conclusion that Defendant knowingly shot and killed Mr. Kemp. Despite threatening Mr. Kemp and Ms. Minor with physical violence prior to the shooting, Defendant was invited into the couple's home in an effort by Mr. Kemp and Ms. Minor to resolve their differences with Defendant. While the three were sitting around the kitchen table, Defendant made an advance towards Ms. Minor. When Mr. Kemp and Ms. Minor expressed their anger with Defendant's action, the party started loudly arguing and moved out of the kitchen. Ms. Minor told Defendant that he needed to leave the home; however, Defendant refused to do so and insisted on finishing his laundry. Then, as Ms. Minor briefly faced away from the two men, Defendant drew his firearm. Mr. Kemp was unarmed, and Ms. Minor later found his pistol in the glovebox of his truck. Ms. Minor testified, and Defendant confirmed, that Defendant fired two shots. According to Ms. Minor's testimony, Mr. Kemp was facing Defendant when Mr. Kemp was struck by the first shot. Then, as Mr. Kemp turned and started moving away from Defendant and towards the door, Defendant fired a second shot. The medical examiner's testimony supports that the first shot was to the victim's chest at close range, while the second shot was fired from an indeterminate distance, striking the victim in the back. The examiner confirmed that both shots were fatal.

Ms. Minor testified that after Mr. Kemp collapsed to the floor, Defendant prevented her from fleeing the house and forcefully took her cell phone away when she tried to call 911. He then pointed his gun at her face and told her to "shut up" when she began screaming. Defendant did not attempt to render aid to Mr. Kemp, nor did he assist or comfort the children. He took Mr. Kemp's wallet, fled the scene, and disposed of his gun

and Mr. Kemp's wallet. He did not surrender himself to law enforcement until twelve days later.

Insofar as Defendant argues that "his actions were committed impulsively" and in the "heat of passion," thus negating the mental state of "knowing," we disagree. Whether the act that constitutes a killing is "knowing" or done under "adequate provocation" is a question of fact within the province of the jury. *State v. Johnson*, 909 S.W.2d 461, 464 (Tenn. Crim. App. 1995). Here, there is no dispute that an altercation between the men occurred. Nonetheless, while Defendant testified that Mr. Kemp struck him first and drew a firearm thus prompting Defendant to go "two hands with him," the jury was free to reject this testimony. *See Bland*, 958 S.W.2d at 659. Other testimony established that after the shooting, Defendant fled and disposed of the firearm in the woods, concealing its ownership. Ms. Minor testified that she never saw Mr. Kemp with a gun prior to or during the shooting, and she later found Mr. Kemp's firearm in her car. Moreover, the trajectory of one of the bullet wounds suggests Defendant shot Mr. Kemp as he was turned and traveling away from Defendant. *See State v. Reynolds*, 635 S.W.3d 893, 916 (Tenn. 2021) (holding that the evidence was sufficient to establish the intentional nature of the defendant's actions when the victim was shot in the chest and then multiple times in the back while trying to escape). Finally, Defendant's text messages to Mr. Kemp expressed his preexisting animosity towards him. The jury considered the nature of Defendant's assault and actions, and all the circumstances of the case when it decided Defendant acted knowingly, and the jury, by its verdict, rejected Defendant's argument that he acted impulsively and in the "heat of passion." *Davis*, 466 S.W.3d at 69 (citing *Brown,* 311 S.W.3d at 432). Resolving the evidence against Defendant was within the jury's prerogative, and we will not disturb its findings. *Id.* Accordingly, Defendant is not entitled to relief on this issue.

## B. Duty to Retreat Jury Instruction

Defendant challenges the trial court's refusal to instruct the jury that he had no duty to retreat before using deadly force as part of the self-defense instruction when the court found that Defendant was committing the offenses of aggravated criminal trespass and possessing a firearm as a convicted felon at the time of the shooting. The State responds that the evidence did not support such an instruction and that in any event, any error was harmless beyond a reasonable doubt.

A defendant has a constitutional right to a "correct and complete charge of the law." *State v. Hollis*, 342 S.W.3d 43, 50 (Tenn. Crim. App. 2011); *Cauthern v. State*, 145 S.W.3d 571, 600 (Tenn. Crim. App. 2004). Consequently, trial courts are required, without request, "to give 'a complete charge of the law applicable to the facts of the case.'" *Hollis*, 342 S.W.3d at 50 (quoting *State v. Davenport*, 973 S.W.2d 283, 287 (Tenn. Crim. App. 1998)).

- 11 -

"A trial court's refusal to grant a special instruction is error only when the general charge does not fully and fairly state the applicable law." *State v. Hawkins*, 406 S.W.3d 121, 129 (Tenn. 2013) (citations omitted).

"Questions regarding the propriety of jury instructions are mixed questions of law and fact; thus, our standard of review is de novo with no presumption of correctness." *State v. Perrier*, 536 S.W.3d 388, 403 (Tenn. 2017). We review "the charge as a whole in determining whether prejudicial error has been committed." *Hollis*, 342 S.W.3d at 50 (quoting *In re Estate of Elam*, 738 S.W.2d 169, 174 (Tenn. 1987)). "A charge is prejudicially erroneous "if it fails to fairly submit the legal issues or if it misleads the jury as to the applicable law." *Id.* (first quoting *State v. Vann*, 976 S.W.2d 93, 101; and then quoting *State v. Hodges*, 944 S.W.2d 346, 352 (Tenn. 1997)). An error or misstatement in jury instructions is subject to constitutional harmless error analysis. *State v. Faulkner*, 154 S.W.3d 48, 60 (Tenn. 2005).

Pursuant to Tennessee Code Annotated section 39-11-611(b),

(1) Notwithstanding § 39-17-1322, a person who is not engaged in conduct that would constitute a felony or Class A misdemeanor and is in a place where the person has a right to be has no duty to retreat before threatening or using force against another person when and to the degree the person reasonably believes the force is immediately necessary to protect against the other's use or attempted use of unlawful force.[3]

(2) Notwithstanding § 39-17-1322, a person who is not engaged in conduct that would constitute a felony or Class A misdemeanor and is in a place where the person has a right to be has no duty to retreat before threatening or using force intended or likely to cause death or serious bodily injury, if:

(A) The person has a reasonable belief that there is an imminent danger of death, serious bodily injury, or grave sexual abuse;

(B) The danger creating the belief of imminent death, serious bodily injury, or grave sexual abuse is real, or honestly believed to be real at the time; and

(C) The belief of danger is founded upon reasonable grounds.

---

[3] Tennessee Code Annotated section 39-17-1322 provides a defense to prosecution for a weapons violation "if a person possessed, displayed or employed a handgun in justifiable self-defense."

- 12 -

A defendant's conduct and mental state must meet an objective standard of reasonableness for the conduct to be justified under this statutory defense. *State v. Bult*, 989 S.W.2d 730, 732 (Tenn. Crim. App. 1998). "Thus, the mere fact that a defendant believes that his conduct is justified would not suffice to justify his conduct." *State v. Myers*, No. W2023-00771-CCA-R3-CD, 2024 WL 3220928, at *8 (Tenn. Crim. App. June 28, 2024), *no perm. app. filed*. If self-defense is raised, "'[t]he [S]tate has the burden of proving beyond a reasonable doubt that the defendant did not act in self-defense.'" *Id.* (quoting *State v. Belser,* 945 S.W.2d 776, 782 (Tenn. Crim. App. 1996), *overruled on other grounds by State v. Williams*, 977 S.W.2d 101 (Tenn. 1998); Tenn. Code Ann. § 39-11-201(a)(3)).

In Tennessee, "whether an individual acted in self-defense is a factual determination to be made by the jury as the sole trier of fact." *State v. Goode*, 956 S.W.2d 521, 527 (Tenn. Crim. App. 1997) (citing *State v. Ivy*, 868 S.W.2d 725, 725 (Tenn. Crim. App. 1993)). However, "the trial court makes the threshold determination whether to charge the jury with self-defense," and thus "the trial court should consider whether the State has produced clear and convincing evidence that the defendant was engaged in unlawful activity such that the 'no duty to retreat' instruction would not apply." *Perrier*, 536 S.W.3d at 403.[4] "[T]he phrase 'engaged in unlawful activity' applies only to a person's duty to retreat." *Id.* at 399. Thus, "a person is entitled to a jury instruction that he or she did not have to retreat from an alleged attack only when the person was not engaged in unlawful activity and was in a place the person had a right to be." *Id.* at 401. In *Perrier*, our supreme court did not address whether the unlawful activity by the defendant had to have a causal nexus to the defendant's perceived need to defend himself. *Id.* at 404. This court later concluded in *State v. Booker*, No. E2018-01439-CCA-R3-CD, 2020 WL 1697367, at *27 (Tenn. Crim. App. Apr. 8, 2020), *rev'd on other grounds by State v. Booker*, 656 S.W.3d 49 (Tenn. 2022), that there must be a causal nexus "between a defendant's unlawful activity and his or her need to engage in self-defense."

The trial court held hearings outside the jury's presence at the end of the State's proof and at the end of Defendant's proof addressing Defendant's request for a self-defense and a "no duty to retreat" instruction. The court found that self-defense had been fairly raised by the proof and agreed to instruct the jury on self-defense. The State argued that Defendant had committed the offenses of aggravated criminal trespass of a habitation and felon in possession of a firearm and that therefore, the "no duty to retreat" instruction was not required.

---

[4] *Perrier* addressed a former version of the statute that required a defendant to "not [be] engaged in unlawful activity[.]" *See* Tenn. Code Ann. § 39-11- 611(b)(1) (2014 & 2017 Supp.). Effective July 1, 2021, the statute was amended to require that the defendant "not [be] engaged in conduct that would constitute a felony or Class A misdemeanor[.]"

The trial court ultimately found by clear and convincing evidence that Defendant committed aggravated criminal trespass of a habitation, a Class A misdemeanor, at the time of the shooting. *See* Tenn. Code Ann. § 39-14-406(a)(1)-(2), (c)(2). The court reasoned:

> I do think, as I looked at the aggravated criminal trespass last night, even after hearing [Defendant's] testimony, there was—he was asked to leave, and he didn't want to leave right then. So he didn't leave immediately. It was a habitation and his presence, obviously, that heated situation could reasonably [cause] them to be concerned about their safety. And so I do think aggravated criminal trespass has been made by clear and convincing evidence.

The trial court also found that the State established by clear and convincing evidence that Defendant had a prior felony drug conviction, was in possession of a gun before entering Mr. Kemp's house, and, therefore, was a felon in possession of a firearm, a Class C felony. *See* Tenn. Code Ann. § 39-17-1307(b)(1). The court stated that "there are reasons for me to disbelieve [Defendant's] testimony about who brought the gun. And I don't want to say anything more than that now because I don't want to be making the State's argument for them." The court rejected Defendant's argument that the determination of whether he was in possession of a firearm when he entered Mr. Kemp's home was a "question of fact for the jury" as contrary to our supreme court's holding in *Perrier*. The court continued:

> Now, I don't think that's going to be an issue in this case. If the jury believes [Defendant's] explanation of what happened, then he did not have time to retreat. You know, it all happened really fast, and so the duty to retreat instruction doesn't say you have to try to retreat. What it says is, is you have to retreat if you can do so safely. And so in this situation, if you believe his—his version of events, then self-defense isn't going to be a problem. Now, if they don't believe it, then it doesn't matter.
>
> . . . .
>
> Because what it says, in this case, the law of self-defense requires the defendant to have employed all means reasonably in his power, consistent with his own safety, to avoid danger and necessity of taking another's life. And so, you know, his statement is he couldn't do so. And so I don't think it's going to make a big difference one way or the other, but I do think that that's the appropriate instruction under *Perrier*.

The court issued the following self-defense instruction to the jury:

Included in the defendant's plea of not guilty is his plea of self-defense.

If a defendant was in a place where he or she had a right to be, he or she would have a right to use force against the deceased when and to the degree the defendant reasonably believed the force was immediately necessary to protect against the alleged victim's use of unlawful force.

If a defendant was in a place where he or she had a right to be, he or she would also have a right to use force intended or likely to cause death if the defendant had a reasonable belief that there was an imminent danger of death or serious bodily injury, the danger creating the belief of imminent death or serious bodily injury was real, or honestly believed to be real at the time, and the belief of danger was founded upon reasonable grounds.

In this case, the law of self-defense requires the defendant to have employed all means reasonably in his power, consistent with his own safety, to avoid danger and avert the necessity of taking another's life. This requirement includes the duty to retreat in this case, if, and to the extent, that it can be done in safety.

In determining whether the defendant's use of force in defending himself was reasonable, you may consider not only his use of force but also all the facts and circumstances surrounding and leading up to it. Factors to consider in deciding whether there were reasonable grounds for the defendant to fear death or serious bodily injury from the deceased include but are not limited to any previous threats of the deceased made known to the defendant; the character of the deceased for violence, when known to the defendant; the animosity of the deceased for the defendant, as revealed to the defendant by previous acts and words of the deceased; and the manner in which the parties were armed and their relative strengths and sizes.

The burden is on the State to prove beyond a reasonable doubt that the defendant did not act in self-defense.

To convict the defendant, the State must prove beyond a reasonable doubt that the defendant did not act in self-defense. If from all the facts and circumstances you find the defendant acted in self-defense, or if you have a reasonable doubt as to whether the defendant acted in self-defense, you must find him not guilty.

- 15 -

We cannot conclude the trial court erred in refusing to instruct the jury that Defendant had no duty to retreat before using force. Although the proof clearly established that Defendant was invited to Mr. Kemp's residence before the shooting, both Defendant and Ms. Minor testified that Mr. Kemp asked Defendant to leave shortly before the shooting. Thus, the proof established that at time of the shooting, Defendant had no right to be in the residence shared by Mr. Kemp and Ms. Minor. Although this conclusion is sufficient, standing alone, for this court to conclude the trial court did not err in refusing to include the "no duty to retreat" instruction on self-defense, we also observe that at the time of the shooting, Defendant remained on the victim's property, a habitation, without Mr. Kemp's effective consent, and Defendant's actions showed he intended, knew, or was reckless about whether his presence would cause fear for the safety of Mr. Kemp and others. Such proof was sufficient to establish that Defendant was committing aggravated criminal trespass of a habitation, a Class A misdemeanor. *See* Tenn. Code Ann. § 39-14-406(a)(1)-(2), (c)(2). A causal nexus clearly existed between Defendant's aggravated criminal trespass and his perceived need to engage in self-defense; thus, the trial court also properly instructed the jury on "no duty to retreat" in this regard.

Defendant argues that the trial court improperly weighed the evidence in determining that he was engaged in conduct that would constitute a felony or a Class A misdemeanor. He asserts that because the trial court must view the evidence the light most favorable to a defendant when determining whether a general defense such as self-defense has been raised by the proof, *see State v. Hawkins*, 406 S.W.3d 121, 129 (Tenn. 2013), the court must do the same in determining whether a defendant engaged in conduct that would constitute a felony or a Class A misdemeanor. Our supreme court in *Perrier*, however, included no such requirement in making the threshold determination of whether a defendant engaged in conduct that would constitute a felony or a Class A misdemeanor. Rather, our supreme court instructed that "[b]ecause the allegedly unlawful activity will oftentimes be uncharged conduct similar to evidence of prior bad acts, the procedure outlined in Tennessee Rule of Evidence 404(b) should be utilized by the parties." *Perrier*, 536 S.W.3d at 403. We note that although Rule 404(b) requires that proof of the other crime, wrong, or act to be clear and convincing, Rule 404(b) does not require that the trial court view the evidence in the light most favorable to Defendant. *See* Tenn. R. Evid. 404(b)(3).

Regardless, we conclude that if there were any error in the trial court's declining to instruct the jury that Defendant had no duty to retreat, it was harmless beyond a reasonable doubt. *See Perrier*, 536 S.W.3d at 404-05 (concluding that that the trial court's error in instructing the jury on self-defense was "harmless beyond a reasonable doubt because no

reasonable jury would have accepted the defendant's self-defense theory"). "'In order to determine whether an instructional error is harmless, the appellate court must ask whether it appears beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained.'" *Id.* at 405 n.8 (quoting *State v. Cecil*, 409 S.W.3d 599, 610 (Tenn. 2013)).

As our supreme court has noted that "a duty to retreat does not mean that a person cannot defend herself or himself. A defendant may still defend himself even to the point of using deadly force, and as Code section 39-17-1322 makes clear, may be acquitted of a weapons offense if a jury finds that his self-defense was justifiable." *Id.* at 404. The trial court instructed the jury on self-defense, that the State had to prove beyond a reasonable doubt that Defendant did not act in self-defense, and that Defendant had a duty to retreat to the extent that he could safely do so. Based on Defendant's testimony, he tried to exit Mr. Kemp's residence once the argument escalated; Mr. Kemp blocked his path and punched him; Mr. Kemp produced a gun; and Defendant shot Mr. Kemp in self-defense while they were struggling for the gun. Defendant's claim of self-defense was not dependent upon whether he had a duty to retreat, as Defendant testified that Mr. Kemp prevented him from doing so. Furthermore, evidence that Defendant knowingly killed the Mr. Kemp was particularly strong and included Ms. Minor's testimony, the testimony of the medical examiner regarding Mr. Kemp's wounds corroborating Ms. Minor's testimony, Defendant's threats to Mr. Kemp and Ms. Minor in the weeks leading up to the shooting, Defendant's threats to Ms. Minor following the shooting, his stealing Mr. Kemp's wallet, his disposal of the firearm, and his flight from the scene. Thus, any error in the trial court's decision not to instruct the jury that Defendant had no duty to retreat did not contribute to the jury's verdict because no reasonable jury would accept Defendant's claim of self-defense. Defendant, therefore, is not entitled to relief on this issue.

### III. Conclusion

In consideration of the foregoing and the record as a whole, the judgments of the trial court are affirmed.

_____
/s/ Matthew J. Wilson
MATTHEW J. WILSON, JUDGE